UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONES ASSIGNED CALL NUMBERS (617) 380-9275 AND (978) 397-0347 | No. 20-mj- 237-01-DL<br><br>**[UNDER SEAL]** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Casey T. MacDonald, being duly sworn, depose and state as follows:

## I.    PURPOSE OF THE AFFIDAVIT

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (617) 380-9275 ("**MIKEY PHONE**"), with no listed subscriber or subscriber address, believed to be used by an unknown male referred to as "Mikey," ("MIKEY"), and cellular telephone assigned call number (978) 397-0347 ("**CARLITO PHONE**"), believed to be used by a Hispanic male referred to as "Carlito," ("CARLITO") with no listed subscriber name or address.  Service is provided for both **MIKEY PHONE and CARLITO PHONE** by T-Mobile USA, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey. **MIKEY PHONE** and **CARLITO PHONE** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. As described more fully in Attachment B, this application requests data about the physical

location of **MIKEY PHONE** and **CARLITO PHONE** including but not limited to
E-911 Phase II data (or the specific latitude and longitude or other precise location
information) for a period of thirty (30) days.

## AGENT BACKGROUND

2.      I am a Special Agent with the Drug Enforcement Administration
("DEA"). I have been employed as a Special Agent with the DEA since May 2014. I
graduated from the DEA Special Agent Academy, where I was trained in drug
investigations, narcotic identification, search warrants, undercover techniques,
surveillance, debriefing of informants and other investigative procedures. I am
currently assigned to the Southern New Hampshire Drug Enforcement
Administration's High Intensity Drug Trafficking Area Task Force ("HIDTA") as a
Special Agent.  Prior to joining the DEA, I spent four years as an Officer with the
United States Secret Service Uniformed Division.  I hold a master's degree in
criminal justice from the University of Massachusetts. My duties and
responsibilities include the investigation of federal crimes, including violations of
the Controlled Substances Act.

3.      Since joining the DEA, I have participated in ten wiretap
investigations and several other investigations where I analyzed telephone toll
records and subscriber information. I have received significant training in the field
of narcotics enforcement and investigations. Through my training, education, and
experience, I have become familiar with the manner in which drug trafficking
organizations ("DTOs") conduct their illegal activities, including purchasing,

manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts. These investigations involved but were not limited to the following controlled substances: heroin, fentanyl, cocaine, marijuana, and prescription opiates.

## BASIS OF INFORMATION

4.     I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a.   my experience investigating drug-trafficking offenses;

b.   oral and written reports and documents about this investigation that I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies;

c.   discussions I have had personally concerning this investigation with experienced narcotics investigators;

d.   physical and fixed camera surveillance conducted by the DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

    e.   public records and law enforcement databases;

    f.   Title III intercepts of wire and electronic communication;

    g.   telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    h.   geolocation information; and

    i.   conclusions based on interpretations of conversations and text messages intercepted pursuant to court-authorized interception of wire and/or electronic communications made by me and other experienced law enforcement agents.

5.    Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers and Spanish-language interpreters.  When information is based on my personal knowledge or conclusion, it will be so stated.

6.    Conversations and discussions below are set forth in substance only unless noted otherwise. Dates, times, and amounts are approximate. Because many conversations discussed below occurred in Spanish, I have included preliminary translations provided to me by agents or interpreters fluent in both English and Spanish.  Any statements excerpted from intercepted communications, including those that are translated and quoted herein, are subject to further revision.

7.    Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant,

I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

8.      Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) have been committed, are being committed, and will be committed by CARLITO, MIKEY, Manuel Emilio Delacruz-Diaz ("DELACRUZ-DIAZ"), and others known and unknown. I submit that there is also probable cause to believe, and I do believe, that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

II.     **PROBABLE CAUSE**

9.      Since the spring of 2019, the DEA has been conducting an investigation of a drug trafficking organization (DTO) led by Luis ARAUJO-GUERRERO.  In furtherance of this investigation, on March 13, 2020, District Court Judge Paul J. Barbadoro, District of New Hampshire, authorized Title III interceptions of two telephones held by ARAUJO-GUERRERO.  Based upon information obtained from a variety of sources, including confidential sources, cell

phone location information, physical surveillance, and the Title III intercepts, agents learned that ARAUJO-GUERRERO was being supplied narcotics by VALDEZ-AYBAR, as well as by his brother, Santo Araujo-Guerrero Jr. a.k.a. Belky ("BELKY").

10.     On August 25, 2020, District Court Judge Paul J. Barbadoro, District of New Hampshire, authorized Title III interceptions of telephones held by VALDEZ-AYBAR and BELKY.  During this interception period, agents identified DELACRUZ-DIAZ as a source of drug supply for VALDEZ-AYBAR, and agents later learned that (978) 828-4247 ("**TT-6**") was a telephone that was being used by DELACRUZ-DIAZ.  Agents also intercepted several conversations between BELKY and VALDEZ-AYBAR, and through these conversations identified (346) 348-8479 ("**TT-7**") as a telephone used by VALDEZ-AYBAR to coordinate drug purchases.

11.     On October 20, 2020, District Court Judge Paul J. Barbadoro, District of New Hampshire, authorized Title III interceptions of **TT-6** and **TT-7**, and agents intercepted wire and electronic communications on the two numbers for a 30-day period, which ended November 18, 2020.

12.     On November 11, 2020, District Court Judge Paul J. Barbadoro, District of New Hampshire, authorized renewed Title III interceptions of **TT-6,** as well as initial interceptions over three additional phones, for a 30-day period, which ended December 24, 2020. During this period of interception, **TT-6** was in frequent contact with **MIKEY PHONE** and **CARLITO PHONE**, discussing the purchase of bulk narcotics in the Lawrence, Massachusetts area.

13.     For example, on December 18, 2020 at approximately 11:38 p.m., Session 4706, DELACRUZ-DIAZ called CARLITO from **TT-6** to discuss the milling of a suspected drug sample that they had acquired earlier in the day:

| | |
|---|---|
| **DELACRUZ-DIAZ**: | Everything ready? You made it? |
| **CARLITO**: | Of course? |
| **DELACRUZ-DIAZ**: | How did you do it? Just to know |
| **CARLITO**: | 20 |
| **DELACRUZ-DIAZ**: | Did you do your calculations correctly? |
| **CARLITO**: | 50 plus 20, totals 70 |
| **DELACRUZ-DIAZ**: | Yeah. What time tomorrow will you be getting an answer for that? |
| **CARLITO**: | I will call you when they call me. Don't start. |

14.     I believe that in this conversations, DELACRUZ-DIAZ was asking CARLITO if he had prepared a drug sample to be tested. I believe that when asked, "How did you do it," DELACRUZ-DIAZ was referring to the ratio between drugs and cutting agent. When CARLITO replied, "50 plus 20, totals 70," I believe he was saying that he took 20 grams of drugs and added 50 grams of cutting agent, to make 70 grams total.  I believe that CARLITO then sent the drugs to an unknown drug tester who would use the drugs and determine the potency. In my training and experience, drug traffickers will often pay trusted drug users to test their product in order to determine if it is of good quality. In this case, I believe DELACRUZ-DIAZ was waiting for the drug test results before arranging the purchase of a bulk quantity of drugs.

15.     On the following day, MIKEY was intercepted arranging the sale of

bulk drug product for Saturday, December 19, 2020.  At approximately 6:33 p.m., in

Session 4573, DELACRUZ-DIAZ called MIKEY from **TT-6** to **MIKEY PHONE** and

had the following exchange:

| | |
|---|---|
| **DELACRUZ-DIAZ**: | Boss, I have tried calling you a few times. Tell me if I am right or not. |
| **MIKEY**: | What happened? |
| **DELACRUZ-DIAZ**: | You saw the guy who went with me to the house yesterday? |
| **MIKEY**: | Yes |
| **DELACRUZ-DIAZ**: | The guy called me earlier. Those are not problematic people. He told me they are going to buy half with the tickets. |
| **MIKEY**: | Yeah. |
| **DELACRUZ-DIAZ**: | Boss he grabbed 50, so he would only be grabbing 450 |
| **MIKEY**: | Yeah |
| **DELACRUZ-DIAZ**: | With the tickets |
| **MIKEY**: | Yeah |
| **DELACRUZ-DIAZ**: | The other one is saying that we cannot cut it. I said, "Buddy you are talking too much shit. Ask your friend Mikey if you want. Ask him if that's a good deal." What do you think of that? |
| **MIKEY**: | Of course that's a good deal. He's in the wrong. |
| **DELACRUZ-DIAZ**: | My brother they have the money. The guy has called me like five times, to go see you, |

8

|  | so he can grab the 450. He knows that out of the 500, he only has 450, because he already grabbed 50. |
|---|---|
| **MIKEY**: | Of course |
| **DELACRUZ-DIAZ**: | He will be paying the money. Cash money. |
| **MIKEY**: | Yeah |

16.     I believe that in this conversation, DELACRUZ-DIAZ was talking to MIKEY about purchasing 500 grams of suspected fentanyl. I believe that this is the same drug order that DELACRUZ-DIAZ was previously discussing sampling with CARLITO a day earlier. DELACRUZ-DIAZ also told MIKEY that they have the "tickets" which I know to be a code word for money. When DELACRUZ-DIAZ stated that, "he already grabbed 50," I believe he was referencing the sample that CARLITO currently had in his possession. I believe that of this "50," CARLITO had taken 20 grams of pure drugs and added 50 grams of cut to then have tested.

17.     After this call, at approximately 6:51 p.m., in session 4754, CARLITO called DELACRUZ-DIAZ at **TT-6** using the **CARLITO PHONE**.

| **DELACRUZ-DIAZ**: | I am more desperate than you man. I want to be done with this already. And we have already... |
|---|---|
| **CARLITO**: | Dude if you would have said that this was going to take this long, I would have said no to you this afternoon. That way I would have had him get his own stuff. Now it's all on me. That man gave me so much shit. Saying "I am here with a million calls." |
| **DELACRUZ-DIAZ**: | Well let me call and see. |

**CARLITO**:                    Alright.

18.     I believe that CARLITO is complaining that it was taking a long time to get the remainder of the drugs he was purchasing. I believe that CARLITO was telling DELACRUZ-DIAZ that his drug customer, another drug dealer, was complaining that he had "a million calls," from customers waiting for drugs. DELACRUZ-DIAZ then stated that he would "call and see."

19.     Following this call, on December 19, 2020, at 7:01 p.m., in Session 4578, MIKEY called DELACRUZ-DIAZ on **TT-6** with **MIKEY PHONE** and the following is an excerpt from their conversation:

**DELACRUZ-DIAZ**:       Did you get in touch with that mouse?

**MIKEY**:                    I hit him up, and he hasn't even seen the message

**DELACRUZ-DIAZ**:       Nothing comes up?

**MIKEY**:                    No. It doesn't come up read, you know.

**DELACRUZ-DIAZ**:       It seems that he does not have WhatsApp because I have hit him up at both WhatsApp numbers and it seems like it doesn't have like Internet

**MIKEY**:                    The message went through.

**DELACRUZ-DIAZ**:       Oh it went through?

**MIKEY**:                    Yes

**DELACRUZ-DIAZ**:       Oh, I called a friend of his in Bogota.  His name is Edward [ph] in Colombia.  I said, "Man tell Danaury [ph] to please call Mikey."

**MIKEY**:                    Yes

10

| | |
|---|---|
| **DELACRUZ-DIAZ**: | I told him exactly like that, because Mikey, the guy has set my phone on fire. |
| **MIKEY**: | He wants it. He needs it. |
| **DELACRUZ-DIAZ**: | Yes. The story I told him was that you were in Maine and you are coming down from Maine. |
| **MIKEY**: | That's good, okay. |

20.     In this conversation, I believe that MIKEY and DELACRUZ-DIAZ were talking about Jhon Albeiro Parada-Ramirez ("PARADA-RAMIREZ") who I believe to be the source of the drugs that MIKEY and DELACRUZ-DIAZ were trying to sell to CARLITO. I know that PARADA-RAMIREZ has been intercepted talking to DELACRUZ-DIAZ in the past discussing bulk drug shipments to the northeastern United States. I believe that MIKEY and CARLITO had asked for permission to split a kilogram of suspected fentanyl in half in order to sell it to CARLITO. I believe that MIKEY told DELACRUZ-DIAZ that he sent a message, but had not heard back from PARADA-RAMIREZ. DELACRUZ-DIAZ then told MIKEY that he called one of his friends in Bogota, Colombia and told him to have PARADA-RAMIREZ call MIKEY.  I know that the telephone that is believed to be used by PARADA-RAMIREZ has been in the Bogota, Colombia area since December 12, 2020. I believe that DELACRUZ-DIAZ lied to CARLITO and said that MIKEY was in Maine in order to get more time to receive permission from PARADA-RAMIREZ.

21.     Later in this same call, MIKEY told DELACRUZ-DIAZ that if his customer was willing to pay more, that he could provide the drugs from his own

stockpile:

| | |
|---|---|
| **DELACRUZ-DIAZ:** | If he calls you let him know what's going on and you let me know if he wants it or not, so I can tell him to look somewhere else. To forgive me and look somewhere else, okay? |
| **MIKEY**: | Yes. If he would pay a bit more like 44 or 45, I would get him some, but damn, that is cheap |
| **DELACRUZ-DIAZ**: | Well, but Mikey |
| **MIKEY**: | Mhh hmm |
| **DELACRUZ-DIAZ**: | Let me see... So charge him 42. Do you have something else around? |
| **MIKEY**: | I think there is something else around |
| **DELACRUZ-DIAZ**: | Give it to him at 42 so I can tell him, because he is desperate |
| **MIKEY**: | Yeah? |
| **DELACRUZ-DIAZ**: | Mikey it is with the tickets |
| **MIKEY**: | I would give it to him at that. No problem. |

22.     Based on this call I believe that DELACRUZ-DIAZ and MIKEY decided that they would offer CARLITO a different half-kilogram of drugs because they couldn't get permission to split the previous kilogram in half. I believe that DELACRUZ-DIAZ said that if he can charge $42,000, then he could convince CARLITO to pay the extra money. Mikey agreed with that price and the two men ended their call shortly after.

23.     In a subsequent call at 7:17 p.m., Session 4579, DELACRUZ-DIAZ called the CARLITO PHONE using **TT-6** and told CARLITO "Wait for me there… I

have to talk about something with you. Wait for me there." CARLITO affirmed and the call ended.

24.     At approximately 7:35 p.m., the court ordered GPS attached to DELACRUZ-DIAZ's White Jeep Cherokee arrived at 326 Prospect Street, the home of CARLITO. At this same time, in Session 4760, DELCRUZ-DIAZ called the CARLITO PHONE and told CARLITO, "I am here." Agents then observed DELACRUZ-DIAZ exit the vehicle and walk into CARLITO's building.

25.     At approximately 7:51 p.m., agents observed DELACRUZ-DIAZ and an unknown male, later determined to be CARLITO, exit 326 Prospect Street. DELACRUZ-DIAZ entered his vehicle, while CARLITO walked down the street and entered the passenger seat of a silver Nissan Rogue. Both cars then departed in the same direction, westbound through Lawrence.

26.     At approximately 7:53 p.m., in Session 4762, DELACRUZ-DIAZ called the MIKEY PHONE and had this exchange:

| | |
|---|---|
| **DELACRUZ-DIAZ:** | Mikey, I am going there with the guy.  He is behind me. |
| **MIKEY**: | Ok |
| **DELACRUZ-DIAZ**: | Listen to what is going on Mikey |
| **MIKEY**: | Uhh-hmm |
| **DELACRUZ-DIAZ**: | We don't have to tell him anything, just "I know the guy, he is cool." |
| **MIKEY**: | Uhh-hmm |
| **DELACRUZ-DIAZ**: | He is a responsible kid |
| **MIKEY**: | Ok no problem |

13

**DELACRUZ-DIAZ**:              You know Mikey, the money is there. We will verify to see if it's a little better than the other or the same.

27.     Based on this exchange, I believe that DELACRUZ-DIAZ convinced CARLITO to buy the other drugs for an increased price. I believe that he is telling MIKEY that CARLITO will have to test it but that he has the cash and that he is a trustworthy buyer. I also believe that DELACRUZ-DIAZ confirmed that the other male who got into the Nissan Rogue was in fact CARLITO, following him to MIKEY's location.

28.     Agents followed DELACRUZ-DIAZ and CARLITO as it traveled to the Milton Street area of Lawrence. At approximately 8:03 p.m., agents located DELACRUZ-DIAZ's White Cherokee and the Nissan Rogue parked in front of the side driveway of 570 Haverhill Street. At approximately 8:04 p.m., in Session 4764, DELACRUZ-DIAZ called the **MIKEY PHONE** and told him "I'm down here." MIKEY affirmed and the call ended.

29.     At approximately 8:17 p.m., I observed DELACRUZ-DIAZ emerge from the side driveway area of 570 Haverhill Street, walk around the rear of the Silver Nissan Rogue and talk to the driver, signaling for him to follow him. DELACRUZ-DIAZ entered his vehicle, with the Nissan Rogue following closely behind, with his lights off. Approximately one minute later, in session 4766, DELACRUZ-DIAZ called the CARLITO PHONE and told him that he was driving without his headlights on. CARLITO could be overheard telling the driver to turn his headlights on. In a subsequent call, Session 4767, DELACRUZ-DIAZ called the CARLITO

PHONE and CARLITO told him, "we are behind you, you have a police car there. Get off the damn phone." DELACRUZ-DIAZ asked where the police were and the call ended.

30.     Agents continued to follow both vehicles in tandem as they drove to CARLITO's building. At approximately 8:26 p.m., both cars got to the area of 326 Prospect Street. Agents observed CARITO get dropped off in front of his house, while DELACRUZ-DIAZ parked across the street approximately one minute later. At approximately 8:27 p.m., in Session 4770, DELACRUZ-DIAZ called CARLITO phone and said, "you go slow." CARLITO replied, "Manny, stop talking bullshit and go inside the house. I am here." The call ended and agents observed DELACRUZ-DIAZ cross Prospect Street and walk directly to the front door of CARLITO's residence.

31.     Based on these events, I believe that DELACRUZ-DIAZ and CARLITO picked up bulk drugs from MIKEY at his apartment building on 570 Haverhill Street, Lawrence, Massachusetts. I believe that they brought the drugs back to CARLITO's apartment building located at 326 Prospect Street, Lawrence, Massachusetts. Both of these buildings are multi-unit apartments and at this time, investigators have not been able to identify either the MIKEY apartment or the CARLITO apartment. I know from previous intercepts that CARLITO has milled drugs at his residence in the past. I know that DELACRUZ-DIAZ frequently conducts drug business with CARLITO at his residence. I also believe that MIKEY is a kilogram level drug trafficker that is operating out of the apartment building at

570 Haverhill, however it is a multi-unit building and MIKEY has no identifiable connection to current listed tenants.

32.     I believe that location information obtained from **MIKEY PHONE** and **CARLITO PHONE**, when used in conjunction with surveillance may assist the United States in allowing investigators to identify and conduct surveillance at location(s) where MIKEY and CARLITO conduct drug sales, process drugs, or store bulk drugs.  Furthermore, agents believe that the location information could help to identify drug associates, sources of supply, and help to better understand the daily operations these individuals.

33.     In my training and experience, I have learned that T-Mobile USA is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or

more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

34.     Based on my training and experience, I know that T-Mobile USA can collect E-911 Phase II data about the location of **MIKEY PHONE** and **CARLITO PHONE**, including by initiating a signal to determine the location of **MIKEY PHONE** and **CARLITO PHONE** on T-Mobile USA networks or with such other reference points as may be reasonably available.

35.     Based on my training and experience, I know that T-Mobile USA can collect cell site data about **MIKEY PHONE** and **CARLITO PHONE.**

### III.     <u>AUTHORIZATION REQUEST</u>

36.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

37.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 90 days after the collection authorized by the warrants has been completed.  There is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the user(s) of **MIKEY PHONE** and **CARLITO PHONE** would seriously jeopardize the ongoing investigation, as such a disclosure

would give this person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a (b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

38.    I further request that the Court direct T-Mobile USA to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile USA.  I also request that the Court direct T-Mobile USA to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile USA's services, including by initiating a signal to determine the location of the **MIKEY PHONE** and **CARLITO PHONE** on T-Mobile USA's networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate T-Mobile USA for reasonable expenses incurred in furnishing such facilities or assistance.

39.    I further request that the Court authorize execution of the warrant at

any time of day or night, owing to the potential need to locate the **MIKEY PHONE**

and **CARLITO PHONE** outside of daytime hours.

I declare that the foregoing is true and correct.

/s/ Casey T. MacDonald
Casey T. MacDonald, Special Agent
U.S. Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date

pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this

affidavit and application.

Date:  12/29/2020

Time:  2:17 p.m.

HON. DANIEL J. LYNCH
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number **(617) 380-9275** with no listed subscriber or address, with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, and used by an unknown male referred to as "Mikey."

2.      The cellular telephone assigned call number **(978) 397-0347** with no listed subscriber or address, with service provided by T-Mobile USA, and used by a Hispanic male referred to as "Carlito" (together "the Target Telephones").

3.      Information about the location of the Target Telephones that is within the possession, custody, or control of T-Mobile USA including information about the location of the cellular telephones if either or both is subsequently assigned a different call number.

## ATTACHMENT B

## Particular Things to be Seized

All information about the location of the Target Telephones described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Telephones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile USA, T-Mobile USA is required to disclose the Location Information to the government.  In addition, T-Mobile USA must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile USA's services, including by initiating a signal to determine the location of the Target Telephones on T-Mobile USA's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate T-Mobile USA for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).